No. 86,895

STATE OF KANSAS, *Appellee*, v. HENTON BRYANT, *Appellant*.
(78 P.3d 462)

Opinion filed October 31, 2003.

*Mary Curtis*, assistant appellate defender, argued the cause, and *Steven R. Zinn*, deputy appellate defender, was with her on the brief for appellant.

*Michael A. Russell*, assistant district attorney, argued the cause, and *Terra D. Morehead*, assistant district attorney, *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: This is a direct appeal from jury convictions of first-degree felony murder, conspiracy to commit aggravated robbery, and aggravated battery. The defendant, Henton Bryant, raises five issues, claiming: (1) the felony-murder rule, K.S.A. 21-3401(b), does not apply to the killing of his co-felon under the facts of the case; (2) he was entitled to have the jury determine, as a defense to felony murder, whether the killing of his co-felon was done in lawful self-defense by the intended robbery victim; (3) the aiding and abetting jury instruction was clearly erroneous requiring reversal of all three convictions; (4) it was error for him to be tried jointly with a codefendant despite the failure to request a severance of trials; and (5) cumulative trial errors substantially prejudiced him and denied him a fair trial. Our jurisdiction is under K.S.A. 22-3601(b)(1), a maximum sentence of life imprisonment imposed.

We find no error and affirm.

## FACTS

On the afternoon of June 11, 2000, Charlie Gray and Henton Bryant drove to the home of Justin Holtsclaw and asked if he would like to spend time with them. This was nothing unusual. Gray and Holtsclaw were best friends, and Gray dated Holtsclaw's sister. They often spent time together. Holtsclaw testified that after they had been driving around for a while, Gray spoke with someone on his cell phone and made arrangements to meet at a car wash at 18th and Minnesota, Kansas City, Kansas. At the car wash, Holtsclaw testified Carlos Castro approached their car and made arrangements with Gray to sell him a kilogram of cocaine. Unwilling or unable to complete the transaction at the car wash, Castro invited Gray and his companions to his apartment. According to Holtsclaw, en route to Castro's apartment, Gray and Bryant informed him that they intended to rob Castro of his drugs and asked him to serve as their lookout during the robbery. Holtsclaw testified:

"[State]: You were supposed to rob —

"[Holtsclaw]: The individuals in the car.

"[State]: And was there any discussion between you all about who was gonna do what or what or who was gonna—you know, what everyone's involvement was gonna be?

"[Holtsclaw]: Yes.

"[State]: Tell me what that was.

"[Holtsclaw]: I was supposed to watch out, and Charlie was supposed to make sure everything in the front room was okay, and [Bryant] was supposed to rob'em."

Following Castro from their meeting place to his home, Gray, Bryant, and Holtsclaw arrived just as Castro and two occupants of his vehicle, Luis Montenegro and Ismael Ramirez, were entering Castro's apartment. Holtsclaw testified that before entering Castro's apartment, Gray and Bryant each removed a pistol from hiding places in Gray's car and placed them in their pants.

Moments later, Gray, Bryant, and Holtsclaw approached Castro's door and were invited in. At trial, both Ramirez and Holtsclaw agreed Castro was holding a package containing what they believed to be a kilo of cocaine when the trio entered.

Castro immediately asked Bryant to follow him to the apartment's bathroom to conduct the transaction. As Bryant followed him to the bathroom, Gray and Holtsclaw entered the apartment. While awaiting the completion of the transaction in the bathroom, Gray paced the living room of the small apartment, Holtsclaw remained standing near the door, and Ramirez and Montenegro sat in the living room.

Within moments, both Holtsclaw and Ramirez heard a gunshot and screams from the bathroom. Holtsclaw testified that Montenegro then stood up and began firing a semi-automatic pistol at Gray and him. In Ramirez' version of events, however, he testified that Gray pulled a pistol, pointed it at him, and threatened, "[Y]ou guys are gonna die." According to Ramirez, Montenegro then drew his pistol in reaction to the threat and fired at Gray.

Holtsclaw and Ramirez agreed that in the confusion, Bryant ran from the bathroom, went through the locked screen door, and made good his escape with Castro's drugs. Holtsclaw testified Montenegro followed Bryant out the door and fired a few shots at Bry-

ant as he ran. Ramirez then hurried to the bathroom in response to Castro's calls.

After Castro was taken to the hospital by friends, Kansas City, Kansas, Police Department detectives contacted him. Following questioning, Castro consented to a search of his apartment. When Detective Golubski arrived there, he found Gray's body just inside the apartment door. A medical examiner testified Gray had died quickly as a result of massive internal bleeding caused by multiple bullet wounds to his chest and back.

Police never found the weapons involved in the shootings nor the cocaine Holtsclaw and Ramirez claimed Bryant took from the scene. Following the killing, Montenegro fled the jurisdiction and has remained unavailable.

On June 14, 2000, the State filed a criminal complaint against both Bryant and Castro. The following day the State amended the charges against Bryant to include felony murder, conspiracy to commit aggravated robbery, and aggravated battery. The relevant portions of the complaint pertaining to Bryant read as follows:

"[O]n or about the 11th of June, 2000, one **Henton Bryant** did unlawfully and feloniously, in the perpetration, attempt to perpetrate, or flight from an inherently dangerous felony, to wit: Aggravated Robbery or Sale of Controlled Substances, kill a human being, to wit: Charles Gray, in violation of K.S.A. 21-3401. (First degree Murder, Off-Grid, Person Felony)

. . . .

### "Count V

". . . [O]ne **Henton Bryant** did . . . unlawfully, willfully and feloniously enter into an agreement with Charles Gray, deceased, and a juvenile, to commit the crime of Aggravated Robbery, as defined by K.S.A. 21-3427, and in furtherance of such agreement overt acts were committed, to-wit: Carlos Castro, the intended robbery victim, was shot, and property was taken from him, all in violation of K.S.A. 21-3302. (Conspiracy to Commit Aggravated Robbery, Severity Level 5, Person Felony).

### "Count VI

". . . [O]ne Henton Bryant did unlawfully, intentionally and feloniously cause great bodily harm to another person, to-wit: Carlos Castro, in violation of K.S.A. 21-3414. (Aggravated Battery, Severity Level 4, Nonperson Drug [sic] Felony)."

Castro was also charged in the same complaint with felony murder — with the sale of cocaine alleged as the underlying felony — and possession of cocaine and marijuana with the intent to sell. After a joint trial, a Wyandotte County jury found Bryant guilty on all counts on November 13, 2000. As to Castro, the jury hung on the felony-murder count and found him guilty of possession of marijuana with the intent to sell and guilty of possession of cocaine, a lesser included offense. Bryant's motion for a new trial alleging various trial errors was denied.

## ANALYSIS

Issues 1 and 2: *Does the felony-murder rule apply to the killing of co-felon Gray and, if so, is Bryant entitled to a self-defense jury instruction?*

Felony murder is the killing of a human being committed in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436 and amendments thereto. K.S.A. 21-3401(b). Bryant essentially contends that, as a matter of law, the felony-murder rule does not apply to his case because of our holding in *State v. Murphy*, 270 Kan. 804, 19 P.3d 80 (2001). There, three individuals entered a residence to commit a robbery, and an occupant shot one of the intruders to death. We held the felony-murder rule would not apply, stating:

"[A] felon may not be convicted of felony murder pursuant to K.S.A. 21-3401(b) for the killing of his co-felon caused not by his acts or actions but by the lawful acts of a victim of aggravated robbery and kidnapping acting in self-defense for the protection of his residence and the occupants thereof." 270 Kan. 804, Syl. ¶ 2.

Accordingly, Bryant argues that his co-felon, Gray, was shot and killed by Montenegro, who acted lawfully in self-defense against Gray's attempt to rob him. The State disagrees and distinguishes *Murphy*. The parties do agree, however, that the issue presented is a question of law over which our review is unlimited. *State v. Sophophone*, 270 Kan. 703, 705, 19 P.3d 70 (2001).

Both parties cite extensively to the felony-murder cases of not only *Murphy* but also *Sophophone*. In *Sophophone,* the defendant, along with three others, ran from their burglary when police ar-

rived. Defendant was captured, handcuffed, and placed in a police car. Thereafter, a police officer chased another of the burglars who shot at the officer. The officer returned fire, killing the burglar. We held the felony-murder rule would not apply; our precise holding was similar to that in *Murphy* quoted earlier:

"A felon may not be convicted of felony murder pursuant to K.S.A. 21-3401(b) for the killing of his co-felon, caused not by his acts or actions but by the lawful acts of a law enforcement officer acting in self-defense in the course and scope of his duties in apprehending the co-felon, who was fleeing from an aggravated burglary in which both felons had participated." *Sophophone*, 270 Kan. 703, Syl. ¶ 6.

We stated in *Sophophone* that our decision was not inconsistent with *State v. Hoang*, 243 Kan. 40, 755 P.2d 7 (1988), where we had extended the reach of the felony-murder rule from the killing of "innocents" to the killing of a co-felon. We additionally stated in *Sophophone* that our decision was not inconsistent with *State v. Lamae*, 268 Kan. 544, 998 P.2d 106 (2000), which also applied the felony-murder rule to the killing of a co-felon. 270 Kan. at 713. As a result, *Sophophone* and *Murphy* simply reveal that the felony-murder rule does not apply when the *lawful acts* of either a law enforcement officer or a victim of a crime cause the death of a co-felon. See *Sophophone*, 270 Kan. at 706 ("it is only because the act which resulted in the killing was a *lawful* one by a third party" that a question arose as to the application of the felony-murder rule); *Murphy*, 270 Kan. at 809 (likening the *lawful act* of the victim in *Murphy* to the *lawful act* of the law enforcement officer in *Sophophone* and adopting the reasoning of *Sophophone*).

Clearly, *Sophophone* and *Murphy* are not applicable here because Gray, Bryant's co-felon, was not killed by a law enforcement officer or by the lawful acts of a victim acting in self-defense for the protection of his residence and the occupants thereof. Therefore, Bryant's claim that, as a matter of law, our holding in *Murphy* requires his conviction for felony murder to be reversed has no merit.

K.S.A. 21-3214 not only reinforces our holding but also rejects Bryant's related argument described in Issue 2 that he was entitled to have the jury instructed it is a defense to felony murder that the

killing was done in lawful self-defense by the intended victim of a robbery. Our legislature has specifically defined those circumstances where a person is justified in using force in defense of a person (K.S.A. 21-3211), in defense of a dwelling (K.S.A. 21-3212), or in defense of other property (K.S.A. 21-3213). It has also specifically barred the justification defense described in these sections for a person who "[i]s attempting to commit, committing, or escaping from the commission of a forcible felony." K.S.A. 21-3214(1). Moreover, in *State v. Mitchell*, 262 Kan. 687, 696, 942 P.2d 1 (1997), we specifically held the self-defense instruction was not available to a participant in a forcible felony which underlay felony murder — just as in the instant case, *i.e.*, sale of cocaine.

In that case, the circumstances of the cocaine sale showed the threat or use of physical force or violence against a person since both the buyer and seller carried and used firearms. Similarly, Gray and Montenegro both carried firearms in a drug deal "gone wrong." Even though the evidence was conflicting whether Gray threatened Montenegro before Montenegro shot and killed him, it is clear that Montenegro was an active participant in the sale of cocaine, a forcible felony.

Issue 3: *Did the district court commit error in submitting an aiding and abetting instruction to the jury?*

Bryant next claims the aiding and abetting jury instruction was not applicable to any of the three felony charges submitted to the jury. That instruction, based on PIK Crim. 3d 54.06, which is entitled "Responsibility For Crimes of Another-Crime Not Intended," reads as follows:

### "INSTRUCTION NO. 8

"A person who intentionally aids another to commit a crime is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, if the other crime was reasonably foreseeable."

Bryant concedes he failed to object to the giving of the instruction; therefore, our standard of review is whether giving the instruction was clearly erroneous. "Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the

trial error had not occurred. [Citation omitted.]" *State v. Evans*, 270 Kan. 585, 588, 17 P.3d 340 (2001).

"When reviewing challenges to jury instructions, we are required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case and a jury could not reasonable have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous. [Citation omitted.]" *State v. Mims,* 264 Kan. 506, 514, 956 P.2d 1337 (1998).

For the charges of aggravated battery and conspiracy to commit aggravated robbery, the aiding and abetting instruction was not necessary. Bryant was the only actor involved in the aggravated battery against the victim, Castro, and the conspiracy to commit aggravated robbery by definition included an anticipatory theory of liability. See *State v. Hobson*, 234 Kan. 133, Syl. ¶ 2, 671 P.2d 1365 (1983) (conspiracy and aiding and abetting are separate and distinct offenses; conspiracy requires an agreement to commit a crime, while aiding and abetting requires actual participation in the act constituting the offense). However, the mere fact that this instruction was given does not mean it was clearly erroneous and requires reversal of these two counts. In essence, Bryant asks us to consider this instruction in isolation, and this we will not do. *Mims*, 264 Kan. at 514. Considering the whole case against Bryant, which included a charge of felony murder based on either aggravated robbery or sale of cocaine, and the correct specific instructions given as to the charges of aggravated battery and conspiracy to commit aggravated robbery, the jury could not reasonably have been misled by the aiding and abetting instruction or returned a different verdict on the aggravated battery and conspiracy to commit aggravated robbery charges.

The impact of the aiding and abetting instruction on the third charge, felony murder, is addressed by several authorities. See, *e.g.*, *State v. Kaiser*, 260 Kan. 235, 242, 918 P.2d 629 (1996); *State v. Pink*, 270 Kan. 728, 736, 20 P.3d 31 (2001); see also PIK Crim. 3d 54.06 (Comment citing authorities for the notion that all participants in a crime are equally guilty, without regard to the extent of their participation; "[t]he other crime must be reasonably foreseeable." Comment also citing *Pink* for express approval of the instruc-

tion in a felony-murder case.). *Kaiser* rejected a challenge to the aiding and abetting instruction by citing to earlier Kansas cases as follows:

"To [show guilt of one who aids and abets,] 'the law requires that the person knowingly associates with the unlawful venture and participates in a way which indicates that such person is furthering the success of the venture.' *State v. Hobson*, 234 Kan. 133, 138, 671 P.2d 1365 (1983). Mere association with the principals who actually commit the crime or mere presence in the vicinity of the crime is itself insufficient to establish guilt as an aider and abettor; however, when a person knowingly associates with the unlawful venture and participates in a way which indicates he or she willfully is furthering the success of the venture, such evidence of guilt is sufficient to go to the jury. *State v. Dunn*, 243 Kan. 414, 429, 758 P.2d 718 (1988)." *Kaiser*, 260 Kan. at 242.

More recently, the *Pink* court approved the aiding and abetting instruction in a felony-murder case where the State's evidence established Pink and another went to a residence with the intent to rob the occupants and some of the occupants were killed in the robbery. 270 Kan. at 736-38. Pink was charged with three counts of felony murder with aggravated robbery as the underlying felony, and his co-felon was the apparent triggerman. At trial, Pink objected to the same instruction which Bryant challenges here and also asked for a mere presence instruction. As the *Pink* court sorted out the claim of instructional error, it stated as follows:

"The [aiding and abetting] instruction actually focuses on the crux of the ultimate question that appears to have determined the issue of guilt in the case. Pink contended through his testimony that he went to Wichita to participate in nothing more than the collection of a debt. The prosecution's evidence, based upon Pink's statements, was that a robbery was intended and Pink knew so. This was the manner in which both the prosecutor and defense counsel centered their final arguments to the jury.

"We should not as Pink suggests isolate only one instruction. Instructions Nos. 1 through 5 concern burden of proof, weight, and credibility of evidence. Numbers 6 through 8 relate to the three counts of murder for which Pink was charged, and the elements of each are set forth.

"The inherently dangerous felony is listed as aggravated robbery. Instruction No. 9 explains the elements of aggravated robbery. Instruction No. 10 is the one complained of by Pink. Instruction No. 11 explains 'intentional.' The remaining instructions deal with procedural matters. When the complained of instruction is read with the other instructions as a whole, they make a proper statement of law as applied to the facts of this case.

"The jury had been presented with Pink's evidence that he joined Bryant in Wichita to collect a debt. He admitted he knew Bryant had a gun but contended that Bryant was not going to use it to commit a robbery.

"The State's evidence, on the other hand, clearly showed that Pink and Bryant went to the residence with the intent to rob the occupants and that several people were killed in a robbery 'gone bad.' *It then became a question for the jury to determine which testimony was the most credible, and if the robbery was intended, whether the shooting deaths of the three men were reasonably foreseeable.*

"It is well established in Kansas that the mere presence of an accused at the time and place of crime alleged is not sufficient to make the accused guilty of the crime. *State v. Wakefield*, 267 Kan. 116, 121, 977 P.2d 941 (1999). *Aiding and abetting means to knowingly associate with an unlawful venture and participate in a way which indicates the participant is willfully furthering the success of the venture. State v. Scott*, 250 Kan. 350, 362, 827 P.2d 733 (1992).

"Pink's argument that the instruction allows him to be convicted of felony murder based upon a felony which was not inherently dangerous fails in light of the other instruction, as well as the closing arguments of both counsel. *The jury was required to find that Pink aided and abetted in the commission of aggravated robbery, which is an inherently dangerous felony sufficient to uphold the felony-murder conviction.* See K.S.A. 21-3436(a)(4)." (Emphasis added.) *Pink*, 270 Kan. at 737-38.

Bryant's case also involves aggravated robbery as a felony underlying a felony-murder conviction, but his case is actually simpler to resolve on the aiding and abetting instruction issue than *Pink*. Bryant failed to object to the instruction given at trial, did not ask for the mere presence instruction, and did not introduce evidence of a conflicting theory; instead, he merely rested after trying to create doubt in the State's case in chief. While his jury was asked to consider two alternative underlying felonies — aggravated robbery and/or sale of cocaine — he concedes that the jury only had to find culpability as to one of these felonies, not both. He does not claim that the presence of two alternate felonies in either the charging document or the instructions creates a problem, and an issue not briefed is deemed abandoned. *State v. Valdez*, 266 Kan. 774, 784, 977 P.2d 242 (1999). Instead, the thrust of Bryant's claim is that it was clearly erroneous for the jury to use aiding and abetting as a theory of guilt on the underlying felonies of aggravated robbery and sale of cocaine. In closing argument, the State distilled its theory of felony murder against Bryant as follows:

"And in this particular case, Henton Bryant is charged with felony murder under the theory that he either went there to commit an [aggravated] robbery or he went there for the purpose of being involved in the sale of illegal narcotics. Both of those are inherently dangerous felonies, and if that was the purpose of going there, and if that's the end result where Charlie Gray was killed, then you have to find him guilty of that crime."

The record establishes that Bryant knowingly associated with the unlawful ventures of aggravated robbery and the sale of cocaine. He participated in both inherently dangerous felonies in a way which indicated he willfully furthered the success of the ventures. Such evidence of his guilt as an aider and abettor was, under *Kaiser,* sufficient to go to the jury. It was then left for the jury to consider the State's theory and decide whether Bryant aided and abetted in the commission of an aggravated robbery or sale of cocaine, both inherently dangerous felonies sufficient to uphold a felony-murder conviction.

When the complained-of instruction is read with the other instructions as a whole, they produce a proper statement of law as applied to the facts of this case. As in *Pink*, the giving of the aiding and abetting instruction was proper.

Issue 4: *Did the district court commit error in trying Bryant jointly with Castro?*

Bryant next claims that he was entitled have his trial severed from Castro. This argument is without merit. He failed to request a severance under K.S.A. 22-3204, which permits a trial court to order a separate trial for two or more defendants jointly charged with any crime "when requested" by either the defendant or the State. A defendant's failure to make such a request, however, is deemed a waiver of the right to request severance. *State v. Pham*, 234 Kan. 649, 651, 675 P.2d 848 (1984). The language in *State v. Pink*, 236 Kan. 715, 728, 696 P.2d 358 (1985), indicating the failure to make such a request is deemed a waiver to the *right of severance* is disapproved. See K.S.A. 22-3204 ("court may order a separate trial").

Issue 5: *Did cumulative trial errors substantially prejudice Bryant and deny him a fair trial?*

Finally, Bryant claims the cumulative effect of all the trial errors he has alleged denied him his right to a fair trial. Our formulation of the cumulative error rule is set forth in *State v. Lumbrera*, 252 Kan. 54, Syl. ¶ 1, 845 P.2d 609 (1992).

"Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant."

We have read the record and considered each of the claims raised by Bryant that are properly before us and upon which he bases his claim of cumulative error. The evidence against him was overwhelming. We conclude that he was not denied a fair trial.

Affirmed.